**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **LATEASE R. ALBRITTON**, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. |
| v. | : | 5:09-CV-00385 (CAR) |
| | : | |
| **SECRETARY OF STATE, et al.**, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | **:** | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Currently before the Court is the Motion for Summary Judgment filed by Defendants Secretary of State, Karen Handel, John Jurkiewicz, Shawn Lagrua, and Christopher Harvey ("Defendants"). In this case Plaintiff LaTease Albritton alleges that she was wrongfully denied a promotion and discharged from her employment with the Office of the Secretary of State of Georgia on the basis of her race and sex and in retaliation for statements she made during a staff meeting. She asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*; 42 U.S.C. § 1981; and 42 U.S.C. § 1983. Upon due consideration of the arguments of counsel, the evidence in the record, and the relevant legal authorities, the Court finds that there are no genuine issues of material fact and that Defendants are entitled to judgment as a matter of law on all claims. Accordingly, and for the reasons set forth below, Defendants' Motion for Summary Judgment [Doc. 19] is hereby **GRANTED**.

# I. SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1090 (11th Cir.1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. <u>See id.</u> at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. <u>See id.</u> at 254-55; <u>see also</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. <u>Celotex</u>, 477 U.S. at 323.

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. <u>See</u> Fed.R.Civ.P. 56(e); <u>see</u> <u>also</u> <u>Celotex</u>, 477 U.S. at

324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir.1991). Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex, 477 U.S. at 323.

## II. MATERIAL FACTS

This case arises from the discharge of Plaintiff Latease R. Albritton ("Plaintiff") from her position with the Professional Licensing Board Division of the Office of the Secretary of State of Georgia ("SoS"). Plaintiff, a black female, was hired as a regulatory agent/investigator with the SoS office in April of 2006. As a regulatory investigator, Plaintiff conducted investigations, interviewed witnesses, gathered evidence, identified violations of state law and board rules, and presented cases to the state elections and professional licensing boards.

During the term of Plaintiff's employment, Defendant Karen Handle was elected Secretary of State; she in turn hired Defendant Shawn LaGrua as her Inspector General and Defendant Chris Harvey as Deputy Inspector General. As an investigator, Plaintiff fell under the supervision of Defendants LaGrua and Harvey. Plaintiff continued to serve as an investigator after the regime change, though she did apply for one of two supervisor positions that became open later that year. Plaintiff did not get the position. Both positions were filled by experienced males, one of which was African-American. A white male was hired to fill the position for which Plaintiff applied. Plaintiff, however, continued on as an investigator and received favorable evaluations.

The next two years of Plaintiff's employment were apparently uneventful, until February of 2009, when Defendant Handel received a copy of an anonymous letter. The letter was sent to the home addresses of members of the Professional Licensing Board and purported to disclose

"untruths, mismanagement, and lies" within the Inspector General's Office. Based on the content of the letter, Defendant Handel suspected that the author was someone within the investigative division.

Defendant Handel accordingly convened and presided over a meeting with the investigative division in Macon. She wanted to find out whether any of the employees knew anything about the origin of the letter or about who may have inappropriately accessed the SoS database to find the home addresses of the board members. Plaintiff attended the meeting, and Defendants LaGrua, Harvey, and Jurkiewicz were also present. During the meeting, Defendant Handel made threats and called the staff "cowards." Some of the employees, including Plaintiff, were offended and responded to her invitation to speak. Plaintiff expressed her displeasure in the manner in which the meeting was being conducted. Plaintiff has since stated that, at the meeting,

> "I told them I thought it was wrong to be talked to in that manner, that I didn't know anything about the letter, I thought that the letter or whoever had written the letter, maybe they should have come forward with the truth. I told them that I was a professional person, I also said that the language that was used in there and also the manner that they was [sic] speaking to us created a hostile working environment."

Although Plaintiff used the term "hostile working environment," there was no mention of race or gender by Plaintiff or anyone else during the meeting. Still, the meeting did get quite heated. Defendants made accusations and demanded that someone come forward with information about the letter. Voices were raised, harsh things were said, and profanity was used; but this behavior was isolated to the meeting. No one took this tone or otherwise used profane language toward Plaintiff either before or after the meeting. After the meeting, however, Defendant Harvey made a note that Defendants LaGrua and Jurkiewicz felt Plaintiff and two of her co-workers, Merry

Cagle and Romana Dyer, were "aggressive and disrespectful" to Defendant Handel.[1]  Plaintiff did not file any grievance with the Office of the Secretary of State for anything said or done during the meeting; nor did she attempt to talk to any media outlet about the incident.

Following the meeting, Defendant Handel turned over the investigation of the letter's origin to her staff "to pursue in the appropriate way." Defendant Harvey, the Deputy Inspector General, then began reviewing emails of some SoS employees, including Plaintiff, Merry Cagle, Romana Dyer, Lynn Eason, and Rosetta Adams, because of their "reactions, posture and comments" at the meeting.  He thought there may be some email communication among them after the meeting and hoped that a review of the emails would help him identify the author of the letter or at least who accessed the database for the personal information of the board members.  Upon review of Plaintiff's emails, Defendant Harvey became suspicious that Plaintiff was working a second job without approval.  The Office of the Secretary of State had an official policy requiring all SoS employees to obtain written approval from the Division Director before engaging in outside employment.  Violation of this policy could lead to disciplinary action or even termination of the employee.

Plaintiff was engaging in outside employment as an armed security guard.  The Division Director, Defendant LaGrua, had strong concerns about an investigator working after-hours in an unapproved, second, full-time job that required the investigator to be armed.  LaGrua believed that this posed a safety issue and has stated that "I would not approve anyone . . . to work a 40-hour extra job armed when they are armed on my clock all day."  In fact, LaGrua had previously denied a number of employee requests for approval of outside employment because of safety issues

---

[1] Plaintiff asserts that her immediate supervisor, Russell Lewis, stated that Plaintiff was "courteous and responsible."  This, however, is not supported by the record, and it not material to the Court's findings.

involving firearms. LaGrua had also advised Plaintiff that she should seek approval if she was planning to engage in any outside employment in "a law enforcement capacity or in an armed position."

After having learned that Plaintiff was engaged in unauthorized, outside employment, Defendants Harvey, LaGrua, and Jurkiewicz spoke with the Deputy Secretary of State. Defendant LaGrua also contacted Plaintiff's other employer and received confirmation that Plaintiff was employed as an armed security guard. LaGrua received copies of time sheets from Plaintiff's other employer, and he believed these time sheets showed that, on certain dates, Plaintiff was working for her other employer when she was supposed to be working for the SoS.

On March 5, 2009, Plaintiff was interviewed by Defendants Harvey, LaGrua, and Jurkiewicz. When questioned, Plaintiff admitted that she had outside employment but denied working for both employers at the same time.[2] She also denied carrying a weapon as part of her outside employment; Plaintiff now admits that this was a lie. Plaintiff was terminated from employment with the SoS Office that same day. Defendant LaGrua stated that Plaintiff was terminated for failing to get prior authorization for outside employment, lying when questioned about her outside employment, and falsifying her time sheets by claiming that she was working for the SoS Office when she was actually working for another employer. In April of 2009, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).

At the time of her discharge, Plaintiff's annual salary was approximately $36,992.00. She had not received any merit increases because all merit increases in pay ceased in January of 2007

---

[2] In her deposition Plaintiff explains that both jobs required her to work forty hours per week; she would work for the SoS from 8:30am until 5:00pm and then work the night shift for her other employer from 11:00pm until 7:00am, returning to work at the SoS only an hour later. Plaintiff is "a person who hardly ever gets any sleep." (Albritton Depo. at 61-62).

due to budget constraints. However, other investigators were hired at a salary equal to or higher than Plaintiff's salary. In 2008, Bruce Phelps, a white male who had technical expertise as an embalmer and Emergency Medical Technician and fifteen years of experience as a law enforcement officer, was hired at a salary of $41,605.00. In April of 2009, Plaintiff was replaced by an African-American male, Adrick Hall, who was hired at salary of $41,905.00. However, the highest salaried SoS investigator is an African-American female, Denise Williams, and at least one white male, Michael Browning, was paid less than Plaintiff at the time she was discharged.

## DISCUSSION

Plaintiff filed her Complaint, stating claims for disparate treatment and retaliation "on the basis of her race" in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981. Plaintiff alleged that she was unlawfully discharged because of her race and discharged in retaliation for statements that she made about the hostile work environment created during the February 2009 staff meeting. "Alternatively," Plaintiff alleged that Defendants unlawfully retaliated against her because she spoke out "in opposition to the hostile work environment Defendants created" - an alleged violation of her right to freedom of speech. She alleges, therefore, that she is also entitled to recover, pursuant to 42 U.S.C. § 1983, for violation of her right to freedom of speech under the First and Fourteenth Amendments of the United States Constitution.

Plaintiff essentially recited these same allegations in the Rules 16 and 26 Scheduling and Discovery Order [Doc. 11], describing the nature of the case as follows:

> This is a claim for injunctive relief and compensatory and punitive damages for retaliation because of Plaintiff's exercise of her freedom of speech, deprivation of constitutional rights under color of state law, and employment discrimination.

Plaintiff, an African-American female, was hired by the Secretary of State's office on April 6, 2006 and remained in her job until March 5, 2009. She received an "exceeds" on her last evaluation before she was discharged. During the course of her employment, she has never been disciplined for any job performance or other problem. She was discharged for allegedly failing to disclose outside employment. One or more white employees did the same thing Plaintiff was accused of and were not discharged.

Further, at least one white employee spoke out at the meeting where Plaintiff and another black female also spoke . The black employees were the only employees who were fired.

Thus, at the start of discovery, Plaintiff had articulated only claims for unlawful discharge based upon her race and unlawful retaliation based on her speech at the meeting.

Now, at the summary judgment stage, Plaintiff asserts new claims. Although Plaintiff's retaliation claims essentially remain the same, Plaintiff's disparate treatment claims have morphed and multiplied. In her Brief in Response to Defendants' Motion for Summary Judgment, Plaintiff asserts that she was *paid less*, *denied promotion, subjected to a hostile work environment*, and discharged from her position with the Office of the Secretary of State because of her race *and sex* in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981, and *the Equal Pay Act, 29 U.S.C. § 206(d)(1)*. Apparently, Plaintiff decided to cast a new net across the body of employment discrimination law at the summary judgment stage and embark on a fishing expedition, hoping to catch at least one claim that will raise a genuine issue of material fact. She has failed.

Plaintiff's initial claims for discriminatory discharge and retaliation fail on summary judgment. Plaintiff has failed to identify sufficient evidence to establish a prima facie case of disparate treatment discrimination under Title VII or §1981. Plaintiff has likewise failed to show that her statements in the February 2009 staff meeting were protected by either Title VII or the First Amendment of the United States Constitution such that she can maintain a claim for unlawful

retaliation under either theory. Plaintiff's newly added claims - for failure to promote, hostile work environment, and wage discrimination - are not properly before the Court. Plaintiff raised them for the first time at the summary judgment stage. However, even if the claims were ripe for consideration, they still fail: Plaintiff's Title VII claim for failure to promote is time barred; Plaintiff's Title VII hostile work environment and gender-based wage discrimination claims are not supported by sufficient evidence; and Plaintiff's Title VII race-based wage discrimination claim is deemed abandoned.

**A. Plaintiff's Discriminatory Discharge & Retaliation Claims Fail as a Matter of Law**

Plaintiff's claims for discriminatory discharge and retaliation in violation of Title VII, §1981, and §1983 are properly before the Court and ripe for summary judgment.

1. Plaintiff's Title VII and §1981 Discriminatory Discharge Claims

Plaintiff brings her discriminatory discharge claim under Title VII and 42 U.S.C. § 1981. "Both of these statutes [Title VII and §1981] have the same requirements of proof and use the same analytical framework . . . ." Standard v. A.B.E.L. Serv., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); see also Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1060 (11th Cir. 1994). The Court will, therefore, address the Title VII claims herein with the understanding that the analysis applies to the §1981 claims as well.

Generally, the first question in the Title VII analytical framework is whether the alleged evidence of discrimination offered by the plaintiff is direct or circumstantial. Neither party claims that this case includes direct evidence of discrimination, and in the absence of such evidence, this Court will apply the McDonnell Douglas Corp. v. Green burden-shifting framework. Id. at 1331.

Under McDonnell Douglas, the plaintiff must first demonstrate a prima facie case of discrimination. 411 U.S. 792, 802 (1973). The elements of the prima facie case will depend on the

type of discrimination alleged, and the burden on the plaintiff to establish a prima facie case is light. See Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 439 (11th Cir. 1996). A prima facie case "only requires that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If a prima facie case is established by the plaintiff, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). Once the employer provides a legitimate, nondiscriminatory reason for its action, the plaintiff's prima facie case is rebutted. Id. at 253. The plaintiff must then show that the employer's proffered reasons for its actions were not the real reasons that motivated its conduct, but that the employer's proffered reasons were merely pretext for discrimination. Id.

In this case, Plaintiff asserts a claim for disparate treatment based on her discharge. In her brief, Plaintiff articulates it as both a discriminatory discharge claim and a discrimination in discipline claim. The two claims are essentially the same; as is the analysis of the merit of the claims. Generally, to establish a prima facie case of either discriminatory discharge or discrimination in discipline, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated employees outside of her protected class more favorably. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000). None of the first three elements of the prima facie case are in issue here. Defendants do assert, however, that Plaintiff is unable produce any evidence of the fourth element - that similarly situated employees outside of Plaintiff's protected class were treated more favorably. Thus, at issue is whether Plaintiff can identify a similarly situated employee who engaged in the same or similar misconduct as Plaintiff but was not discharged.

In attempt to prove this element of her case, Plaintiff identifies two relevant "comparators." A proper comparator is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff in all relevant respects. Wilson, 376 F.3d at 1091. "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer" and confusing "apples with oranges." Id; Burke-Fowler v. Orange County, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotation omitted). Where, as in this case, an employee is subjected to disciplinary action or discharged as a form of discipline, the plaintiff must identify comparator employees who were "involved in or accused of the same or similar misconduct" in order for those employees to be "similarly situated" to the plaintiff. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff fails to show the existence of a similarly situated employee, summary judgment is often appropriate. See Wilson, 376 F.3d at 1092.

Here, it is undisputed that Plaintiff was discharged after Defendants learned that she was engaging in unauthorized, full-time, outside employment that required her to carry a firearm. Before confronting Plaintiff with this allegation, Defendant LaGrua contacted Plaintiff's other employer and received confirmation that Plaintiff was in fact employed by that company as an armed security guard. Defendant LaGrua also obtained copies of time sheets from Plaintiff's other employer and believed these documents showed that, on certain dates, Plaintiff was falsifying her SoS time sheets and working for her other employer when she was supposed to be working for the SoS Office.

On March 5, 2009, Plaintiff was called in for a meeting and questioned about her unauthorized outside employment. Plaintiff admitted that she was engaged in outside employment and that she had not received authorization to work a second job even though she knew that she was required to do so. When questioned further, however, Plaintiff denied that she had ever engaged in

outside employment while on the clock for the SoS and denied that she falsified time sheets. Defendants felt that documents in their possession proved otherwise; thus, correctly or not, Defendants concluded that Plaintiff had lied to her superiors before and during the meeting about her outside employment and the hours and times that she had worked. During the meeting, Plaintiff also denied that she carried a weapon as part of her other job. It is undisputed that Plaintiff did carry a weapon when she worked as a security guard and that she lied to her supervisors during the investigation when she was questioned about it. Plaintiff was fired that day. Defendant LaGrua stated that Plaintiff was officially terminated for "failing to get prior authorization for outside employment, lying when questioned about her outside employment, and falsifying her time sheets by claiming that she was working for the SoS Office when she was actually working for another employer."

On summary judgment, Plaintiff claims that two other employees -  a white female investigator, Merry Cagle, and white male investigator, Bruce Phelps - are proper comparators in this case because they engaged in similar conduct as Plaintiff but were not discharged as a result. Like Plaintiff, Merry Cagle was in the February 20, 2010, staff meeting (held to address the infamous letter) and also spoke out in opposition to her supervisors' hostile accusations. Both Plaintiff and Ms. Cagle were said to have been "aggressive and disrespectful" to Defendant Handel, and the emails of both women were thereafter reviewed as part of Defendant LaGrua's investigation. Unlike Plaintiff, Ms. Cagle was not subsequently discharged. Ms. Cagle, however, was never found to have been engaging in unauthorized, outside employment; nor was Ms. Cagle believed to have lied to her superiors. It is irrelevant, therefore, that Ms. Cagle was not discharged as a result of her conduct during the staff meeting or that she may have engaged in some other misconduct for which she was disciplined. There is no evidence that she was involved in or

accused of the same or similar misconduct as Plaintiff. Ms. Cagle was not similarly situated to Plaintiff.

Plaintiff's second proposed comparator, Bruce Phelps, was engaged in unauthorized, outside employment while employed as an investigator with the SoS, and Mr. Phelps was not discharged or even disciplined by Defendants. Yet, Defendants have testified that they did not learn of Mr. Phelps' outside employment until after he was no longer employed by the SoS. Plaintiff provides no admissible, relevant evidence that Defendants knew of his outside employment. In her brief, Plaintiff provides no cite to the record but states that "Phelps bragged about his outside employment with a funeral home in the presence of two supervisors, Michael Smith and Lynn Eason." Evidence stated without citation will not be considered at summary judgment. See M.D. Ga. L.R. 56. Moreover, this statement is not supported by the record, which reveals that, on deposition, a witness stated Michael Smith "heard it." This type of speculation about what another heard or knew is irrelevant and insufficient to defeat summary judgment. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990); Howard v. Oregon Television, Inc., 276 Fed. Appx. 940, 941 (11th Cir. 2008) (unpublished) ("Speculation does not create a genuine issue of fact."). The same is true of Plaintiff's other allegation (not mentioned in her argument) that "[e]verybody knew about Phelps' outside employment." An allegation that "everybody knew" about Phelps' employment is speculative and not supported by the record. More importantly, neither of these statements impute any knowledge of Phelps' outside employment to Defendants. The evidence of what Phelps told others also appears to be inadmissible hearsay, which cannot be considered on summary judgment. See Macuba v. DeBoer, 193 F.3d 1316, 1322 (11th Cir. 1999).

Plaintiff also fails to produce any evidence suggesting that, like Plaintiff, Mr. Phelps engaged in full-time, outside employment that required him to carry a firearm - a fact undisputedly

problematic for Defendant LaGrua. Most importantly, there is no evidence suggesting that Mr. Phelps was ever believed to have falsified his time sheets, worked for another employer while on the SoS clock, or lied to his superiors when questioned about his outside employment. So, there is no evidence that Mr. Phelps was involved in or accused of the same or similar misconduct as Plaintiff. He was not similarly situated.

Thus, while the comparators identified by Plaintiff arguably engaged in some misconduct and perhaps even violated one or more of the same rules Plaintiff was found to have violated, there has been no showing that either of the comparators engaged in all of the misconduct that resulted in Plaintiff's discharge or that their alleged misconduct was nearly identical to hers. Accordingly, after having viewed the evidence in the light most favorable to Plaintiff, the Court finds that she has failed to identify a similarly situated employee who engaged in misconduct nearly identical to hers, but who received a less severe disciplinary sanction.

In her brief, Plaintiff actually contends that "Bruce Phelps was 'untouchable' because he was a friend of Karen Handel . . . ." (Pl. Br. in Response at 18). This statement seems to negate Plaintiff's argument that there was some racial bias. The fact that Mr. Phelps allegedly received favoritism in the office because of his personal friendship with Karen Handel does not prove that such favoritism had anything to do with Mr. Phelps' race; it actually provides an alternative, race-neutral reason for any disparate treatment he may have received. The Court also finds it relevant that Plaintiff was not replaced with someone outside of her protected class. See Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003) (explaining that a plaintiff may also establish a prima facie case of discriminatory discharge by showing that she was replaced by someone outside of her protected class). Plaintiff was, in fact, replaced by an African-American investigator, Adrick Hall, in April of 2009. For these reasons and

because Plaintiff has failed to present similarly situated comparators who were treated differently, the Court finds that she has failed to establish a prima facie case of discriminatory discharge.

Yet, even if Plaintiff was able to state a prima facie case of discriminatory discharge, Defendants have certainly proffered a legitimate, non-discriminatory reason for the decision to discharge Plaintiff: she violated work rules and lied to her supervisors during the internal investigation into her outside employment. Plaintiff, in response, cannot establish that this reason is mere pretext for discrimination. As the Eleventh Circuit Court of Appeals has recently explained, "[a] legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible." Boyland v. Corrections Corp. of America, - - F.3d - -, 2010 WL 3064420 *2 (11th Cir. 2010) (Slip Copy) (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993)). Where the proffered reason is one that would motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must "meet that reason head on and rebut it." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). "When an employer claims that a plaintiff was fired for violating a work rule, the plaintiff may show pretext through evidence (1) that [s]he did not violate the cited work rule, or (2) that if [s]he did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." Boyland, 2010 WL 3064420 at *2; Damon v. Fleming Supermarkets, Inc., 196 F.3d 1354, 1363 (11th Cir. 1999).

Here, Plaintiff has failed to produce any evidence that she did not violate the work rule. She admits (and it is undisputed) that she engaged in outside employment without authorization in violation of official policy and her supervisor's specific prohibition. Plaintiff likewise admits that she lied to her supervisors (at least about whether she carried a firearm in her outside employment)

15

during the internal investigation.  Plaintiff continues to deny that she falsified time sheets or worked for both employers simultaneously; but she does not dispute that Defendant LaGrua believed her denials were contradicted by documents he possessed at the time of her discharge.  Thus, correctly or not, Defendant LaGrua believed, in good faith, that Plaintiff lied to him about this during the investigation as well.  The Court will simply "not second-guess an employer for firing an employee for [violating a work rule and] lying during an important internal investigation unless the employee produces evidence that the employer lacked a good faith belief that the employee lied."  Boyland, 2010 WL 3064420 at *2; EEOC v. Total Sys. Servs., 221 F.3d 1171, 1176 (11th Cir. 2000).  This is especially true where, as here, the plaintiff has failed to show that other employees outside the protected class were not treated similarly.

Apparently, Plaintiff only attempts to establish pretext by citing evidence that, generally, more African-American employees were disciplined than white employees and that, since Plaintiff's discharge, only one African-American investigator has been hired and the total number of African-American employees in the SoS office has decreased.  However, this evidence does not change the fact that Plaintiff undisputedly violated a work rule and lied to her superiors.  The fact that fewer African-American employees now work for the SoS or that more African-American employees have been subject to discipline does not demonstrate Defendants' proffered reasons for terminating Plaintiff are false or that Defendants' real reason is impermissible.

Summary judgment is thus due to be **GRANTED** to Defendants with regard to Plaintiff's discriminatory discharge claim.

2.  Plaintiff's Retaliation Claims

Plaintiff also claims that she was a victim of retaliatory discharge under Title VII and §1981.  In the alternative, Plaintiff claims that she was a victim of retaliatory discharge in violation

of her First Amendment right to freedom of speech, actionable under 42 U.S.C. § 1983. Both of these claims have a common element. To establish a prima facie case under either theory, a plaintiff must demonstrate that the speech for which she was allegedly discharged was "protected" - either by Title VII or the First Amendment. See Williams v. Motorola, Inc., 303 F.3d 1284, 1291 (11th Cir. 2002); Thampi v. Manatee County Board of Com'rs, – F.3d  – , 2010 WL 2600638 *4 (11th Cir. 2010). Here, Plaintiff claims that she was discharged in retaliation for statements she made during the February 20, 2009, staff meeting. In her deposition, Plaintiff testified that, at that meeting:

> "I told them I thought it was wrong to be talked to in that manner, that I didn't know anything about the letter, I thought that the letter or whoever had written the letter, maybe they should have come forward with the truth. I told them that I was a professional person, I also said that the language that was used in there and also the manner that they was [sic] speaking to us created a hostile working environment."

It is, of course, well settled that an employee's conduct in speaking out against unfair employment practices is statutorily protected under Title VII's Opposition Clause if the employment practice is made unlawful by Title VII. See Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1350 (11th Cir. 1999). To establish that her conduct was statutorily protected under the Opposition Clause, a plaintiff must show that she "had a good faith, reasonable belief that the employer was engaged in [an] unlawful employment practice[]" under Title VII. Little v. United Tech ., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). "Unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII." Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995).

In this case, Plaintiff fails to establish that Defendants engaged in any unlawful employment practice based on her race or gender. It is undisputed that neither Plaintiff nor anyone else made any reference to race or gender in the February staff meeting. Moreover, as will be discussed in

more detail below with respect to Plaintiff's hostile work environment claim, there is no evidence that Plaintiff intended to reference a racially or sexually-based "hostile working environment" when she made this statement. In her brief, Plaintiff also fails to draw any link between what was said during the meeting and a race or gender bias. Plaintiff only argues:

> Defendants' actions at the meeting and afterwards were hostile, abusive, and had a chilling effect on the employees. The abusive language and threats created an unwelcomed hostile work environment[.]

(Pl. Brief at 19).

Thus, from both Plaintiff's statement at the meeting and her argument on summary judgment, it seems clear that Plaintiff was simply expressing a personal grievance: Plaintiff, personally, did not like being accused of wrongdoing and did not appreciate the manner in which she and all the other investigators were being accused. There is no evidence that a race or gender bias was the basis for the hostility about which Plaintiff complained. Accordingly, there is no evidence which would allow a jury to find that Plaintiff had a good faith, reasonable belief that her employer was engaged in employment practices made unlawful under Title VII or that she was speaking out against a racially or sexually hostile work environment. Plaintiff's speech was not "protected" under Title VII, and summary judgment is accordingly due to be **GRANTED** in favor of Defendants as to Plaintiff's Title VII retaliation claim.

Plaintiff's speech is also not protected under the First Amendment. To prevail on a First Amendment retaliation claim, a plaintiff must establish that her speech was constitutionally protected. Thampi, 2010 WL 2600638 at *4. An employee's speech will only warrant First Amendment protection if it addressed "matters of public concern." Id. (quoting Boyce v. Andrew, 510 F.3d 1333, 1341 (11th Cir. 2007)). "Whether an employee's speech addresses a matter of public concern [is] determined by the content, form, and context of a given statement, as revealed

by the whole record." Connick v. Myers, 461 U.S. 138, 147-48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). The Eleventh Circuit Court of Appeals has explained that in applying the "content, form, and context" analysis, the following factors should be considered: (1) "whether the speech at issue was made in the employee's role as citizen or as employee," (2) "the employee's efforts to communicate his or her concerns to the public," (3) "the content of the speech," and (4) "the employee's motivation in speaking." Deremo v. Watkins, 939 F.2d 908, 910 (11th Cir. 1991) (internal citations omitted). Generally, when an employee's concerns are focused on the conditions of her own employment and were not spoken in public, but instead, were made in the form of a complaint to her superiors, the speech will not be considered to be a matter of public concern. See Thampi, 2010 WL 2600638 at *4; Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993). Inasmuch, a public employee simply "may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1530 (11th Cir. 1997) (quoting Ferrara v. Mills, 781 F.2d 1508, 1512 (11th Cir. 1986)).

Here, as discussed above, Plaintiff's conduct suggests that she only intended to air a personal grievance in the meeting. Plaintiff's statements were not made as a "citizen" but as a mere employee who was unhappy with her supervisors' tone and vocabulary. Moreover, as discussed above, the record is devoid of any evidence indicating that her supervisors' conduct was based on either a racial or gender bias. Plaintiff spoke only as to her own feelings and professionalism and cannot now invoke some generalized public interest in how a government office is run to transform her personal opinion into a matter of public concern. See id.

Moreover, Plaintiff's statements were only said during the closed meeting and were not expressed elsewhere. No effort was made to make the statements "public." Plaintiff chose not file

a grievance with the Office of the Secretary of State for anything said or done during the meeting; nor did she attempt to talk to any media outlet or the general public about the incident. As such, it appears that Plaintiff's sole motivation in speaking during the meeting was to communicate to her supervisors that *she* felt the meeting was not being conducted properly (i.e., that it was unnecessarily hostile and adversarial) and that *she* did not appreciate being accused of wrongdoing in that unprofessional manner.

The Court finds, therefore, that the time, place, and manner in which Plaintiff complained to her supervisors reveal that Plaintiff was not speaking on an issue of public concern. As a result, her statements are not entitled to First Amendment protection, and summary judgment is accordingly due to be **GRANTED** for Defendants with respect to Plaintiff's First Amendment claim as well.

**B.** **Plaintiff's Failure to Promote, Hostile Work Environment, and Wage Discrimination Claims are Not Properly Before the Court and, Even if Considered, Would Fail As A Matter of Law**

The claims Plaintiff failed to plead in her complaint and added at summary judgment are not properly before this Court. The law is well settled in this Circuit that a non-moving party plaintiff may not raise a new legal claim for first time at the summary judgment stage. See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004) (explaining that the liberal pleading standard under Fed.R.Civ.P. 8(a)(2) does not afford plaintiffs with an opportunity to raise new claims at summary judgment); Thampi v. Manatee County Board Of Com'rs, 2010 WL 2600638 * 3 (11th Cir. Jun. 30, 2010) (slip copy) ("[N]ew claims may not be raised at the summary judgment stage, unless the plaintiff seeks to amend his complaint in accordance with Rule 15(a).").

Plaintiff is not exempted from this rule simply because Defendants address the merits of Plaintiff's possible claims "out of an abundance of caution." (See Deft. Brief in Support at 6.) In fact, the United States Court of Appeals for the Eleventh Circuit recently addressed this issue and held that the district court was not required to allow a plaintiff to pursue a claim raised for the first time at the summary judgment stage simply because the defendant addressed the merits of the claim. See Thampi, 2010 WL 2600638 at * 3 (11th Cir. Jun. 30, 2010). Thus, to the extent that Defendants have objected to the new claims,[3] the Court is not required to consider them; they are

---

[3] Courts that have addressed this issue suggest that claims not raised in the pleadings should be treated like they were properly raised unless the opposing party objects to the claim being raised. See Price v. M & H Valve Co., 177 Fed.Appx. 1, 11 n.7 (11th Cir. 2006) ("[B]ecause M & H Valve objected to Price raising this claim for the first time in his brief opposing summary judgment, this claim was due to be dismissed); see also Steger v. General Elec. Co., 318 F.3d 1066, 1077 n. 11 (11th Cir. 2003) (explaining that, although issues not raised in the pleadings may be treated as if they were properly raised when they either are "tried by express or implied consent of the parties," or "are included in a pretrial order," these exceptions are not applicable if an opposing party objects to the assertion of such a claim without the filing of a supplemental pleading).

not properly before the Court.  See McShane v. U.S. Attorney General, 144 Fed. Appx. 779, 789

(11th Cir. 2005); Champ v. Calhoun County Emergency Mgmt. Agency, 226 Fed. Appx. 908, 912

n.3 (11th Cir. 2007).  Yet, as discussed below, even if the Court was required to address the new

claims, they would still fail as a matter of law.

    1. Failure to Promote Claim

Plaintiff clearly states a disparate treatment claim in the Complaint.  However, Plaintiff's

disparate treatment claim includes only allegations regarding her discharge.  She did not assert any

facts that would give Defendants notice that she intended to raise a failure to promote claim.  At a

minimum, a discrimination claim alleging failure to promote must identify which position the

plaintiff applied for and was rejected.  Hemi v. Solvay Pharms., Inc., 2006 WL 3392758 (W.D.

Mich, Nov. 21, 2006); see also, Lovermi v. BellSouth Mobility, Inc., 962 F.Supp. 136, 139 (S.D.

Fla. 1997) (holding failure to promote claim was due to be dismissed because employee did not

specify that she applied for position or identify position for which she applied).

Here, Plaintiff did not even state that she ever applied for a promotion in the Complaint,

much less any facts identifying the position for which she applied.  Accordingly, Plaintiff also

failed to allege that she was rejected for a higher position and that someone else equally (or less)

qualified was chosen to fill it.  Obviously, the denial of Plaintiff's request for promotion in 2007

occurred long before the present suit was filed in 2009, and Plaintiff certainly knew enough facts at

the time the Complaint was filed to adequately assert a failure to promote claim.  Even if Plaintiff's

counsel only learned that Plaintiff may have a viable failure to promote claim during discovery,

Plaintiff still never sought leave to amend the Complaint to include a failure to promote claim.  As

Defendants contend, Plaintiff raised her failure to promote claim for the first time at the summary

judgment stage.  The claim is not properly before the Court, and the Court need not consider this

claim before granting summary judgment.  McShane, 144 Fed. Appx. at 789; Champ, 226 Fed. Appx. at 912 n.3.

However, even if Plaintiff's Title VII failure to promote claim had been raised prior to summary judgment, the claim would still fail as a matter of law.  The claim is time barred.  It is well settled that, in Georgia, a plaintiff has only 180 days after a promotion decision to file a claim with the EEOC.  See Bennett v. Chatham County Sheriff Dept., 315 Fed. Appx. 152, 161  (11th Cir. 2008).  In this case, it is undisputed that the decision not to promote Plaintiff occurred in December of 2007, and Plaintiff did not file any charge with the EEOC until April 22, 2009, more than 477 days after the decision.

Plaintiff argues that the claim is somehow revived by the Lilly Ledbetter Fair Pay Act of 2009, Pub.L. No. 111-2, 123 Stat. 5 (2009).  Recently enacted, the Ledbetter Act provides an extension of the time period in which victims of discrimination can challenge and recover for "discriminatory compensation decisions or other practices."  Id.  However, Plaintiff's reliance on the Act in this case is misplaced.  The scope of the Act is limited to claims of discriminatory compensation decisions or practices, and district courts interpreting it have uniformly held that it does not apply to generalized discrimination claims, including failure to promote.  See e.g., Canaday v. Wynne, -- F.Supp.2d --, 2010 WL 2688065 *10 (N.D. Fla. April 26, 2010) (finding that failure to promote claim did not qualify as a "compensation decision or other practice" within the meaning of that phrase in the Act); Lipscomb v. Mabus, 699 F.Supp.2d 171, 2010 WL 1198891 *3 (D.D.C. 2010) (same); Harris v. Auxilium Pharmaceuticals, Inc., 664 F.Supp.2d 711, 744-47 (S.D. Tex. 2009) (same).

The United States Court of Appeals for Eleventh Circuit has not addressed the issue of whether the phrase "discriminatory compensation decision or other practice" in the Ledbetter Act

refers to a decision to promote one employee but not another to a more remunerative position; but one Circuit has addressed the issue and held that the Act does not apply to promotion decisions. See Schuler v. Pricewaterhouse Coopers, L.L.P., 595 F.3d 370, 374 (D.C. Cir. 2010). Like Plaintiff, the aggrieved employee in Schuler, complained that a decision not to promote him was intertwined with "a discriminatory compensation decision" because, from that point on, he received significantly less pay than he would have had be received the promotion. Id. The District of Columbia Circuit Court rejected this position, relying on the fact that the phrase "discrimination in compensation" has a specific meaning in employment law. Id. at 374-75. The phrase is used when an employer is paying different wages or providing different benefits to similarly-situated employees. Id. The phrase is not traditionally used to refer to a decision to promote one employee but not another to a higher paying position. Id. A discriminatory failure to promote claim stands independent of any compensation claim; it is actionable regardless of whether it affects an employee's compensation. In this context, the court refused to interpret the language "compensation decision or other practice" to refer to a decision to promote one employee but not another to higher paying position. Id. at 375.

The Circuit Court further found this interpretation to be consistent with Congress' intent to overrule the Supreme Court's decision in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007), which foreclosed an employee's claim that she "was being paid significantly less than any of her male colleagues." Schuler, 595 F.3d at 375. "That the Congress drafted and passed the [Act] specifically in order to overturn Ledbetter strongly suggests the statute is directed at the specific type of discrimination involved in that case and not to other unspecified types of discrimination in employment." Id.

This Court agrees with the well-reasoned decision of the District of Columbia Circuit Court

and likewise finds that the decision to promote a white male and not Plaintiff to a higher paying position was not a "compensation decision or other practice" within the meaning of that phrase in the Lilly Ledbetter Fair Pay Act. Therefore, even if Plaintiff's failure to promote claim was properly before this Court, the claim cannot be resurrected by the Lilly Ledbetter Act, and summary judgment is due to be **GRANTED** for Defendants with respect to Plaintiff's Title VII failure to promote claim.

It is unclear whether Plaintiff intended to raise a failure to promote claim under both Title VII and §1981, and the Court is well aware that a failure to promote claim brought pursuant to §1981 is not affected by Title VII's exhaustion requirements. Mathis v. Leggett & Platt, 263 Fed. Appx. 9, 12 (11th Cir. 2008); Caldwell v. National Brewing Co., 443 F.2d 1044, 1046 (5th Cir. 1971). However, the Court will not create a §1981 claim for Plaintiff where one is not clearly stated; nor is this Court required to. See Smith v. Secretary, Dept. of Corrections, 572 F.3d 1327, 1352 (11th Cir. 2009) (citing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")). Because Plaintiff made no specific reference to such a claim, the Court finds that Plaintiff did not bring a failure promote claim under §1981. Yet, even if the claim had been articulated, Plaintiff still did not properly plead a §1981 failure to promote claim in her Complaint or otherwise seek leave to amend her Complaint to add such a claim pursuant to Fed. R. Civ. P. 15(a), and thus the Court may decline to consider the claim entirely at summary judgment. See Gilmour, 382 F.3d at 1314; McShane, 144 Fed. Appx. at 789.

2. Hostile Work Environment Claim

Plaintiff likewise raises a Title VII hostile work environment claim for the first time at the summary judgment stage. Plaintiff did not adequately plead this claim in her Complaint and never sought leave to amend her Complaint to add it. The only references of a "hostile work environment"

in the Complaint are allegations that Plaintiff "spoke in opposition to the hostile work environment" created by the supervisors during the February 2009 staff meeting. These references were not used to show that Plaintiff was being subjected to severe or pervasive harassment in the workplace because of her race; they were used to support her retaliation claims.

Contrary to what Plaintiff may want believe, the phrase "hostile work environment" is not magical incantation that automatically makes a claim appear. Plaintiff must do more than simply reference the phrase to state a legal claim under Title VII. Plaintiff's Complaint does not set forth any factual underpinnings of a hostile work environment, as there are absolutely no allegations of severe or pervasive harassment based on her race or gender. Even under the liberal pleading standards of the Federal Rules, Plaintiff's vague reference to a "hostile work environment" in the context of her fairly specific retaliation claim falls short of stating a claim based on a racially or sexually hostile work environment. See Blanton v. Bunch and Associates, Inc., 2006 WL 269981 *8 (M.D. Fla. February 3, 2006). Thus, like Plaintiff's failure to promote claim, the present claim is not properly before the Court.

Nonetheless, Defendants do not seem to object to Plaintiff's addition of this claim. In the absence of objection, the Court will address the claim but finds that Plaintiff's hostile work environment claim is not supported by any evidence which would demonstrate that Plaintiff's workplace was permeated with discriminatory intimidation, ridicule, and insult, and thus it fails as a matter of law.

"A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)

(citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  Here, Plaintiff fails to identify any

evidence indicating that she was subjected to severe and pervasive harassment *because* of her race

or gender.  This is exactly Defendants' argument on summary judgment.  Plaintiff only responded

by arguing that

> Defendants' actions at the meeting and afterwards were hostile, abusive, and had a
> chilling effect on the employees. The abusive language and threats created an
> unwelcomed hostile work environment[.]

(Pl. Brief at 19).  Plaintiff, therefore, does not even appear to argue at summary judgment that the

alleged hostility was motivated by a race or gender bias.  It is undisputed that the meeting in

question did get heated.  Defendants made accusations and demanded that someone come forward

with information about the letter.  Voices were raised, harsh things were said, and profanity was

used.  It is also undisputed, however, that this behavior was isolated to the meeting, and there was

never any mention of race or gender by Plaintiff or anyone else.  In fact, at least one inspector

outside Plaintiff's protected class, Merry Cagle, a white female, was also offended by the tone of

the meeting and, like Plaintiff, was later accused of being "aggressive and disrespectful" to

Defendant Handel.  That a person outside Plaintiff's protected class also felt berated and offended

by Defendants' actions further suggests that the conduct was not directed at Plaintiff and not

motivated by her race.

   Title VII does not impose a "general civility code for the American workplace."  Oncale v.

Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998).

Under the law, employers can be rude, harsh, insulting, and even downright profane - so long as

such conduct is not motivated by a discriminatory intent.  See McCollum v. Bolger, 794 F.2d 602,

610 (11th Cir. 1986) (explaining that Title VII does not shield employees against harsh treatment in

the workplace); Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir. 1999) ("Title VII was never

27

intended to protect employees from all unpleasant and rude conduct in the workplace"). Moreover, even if there was evidence that the hostile remarks during the meeting were directed at Plaintiff *because* of her race or gender, there is certainly no evidence that the conduct or insults were severe and pervasive. This one, non-discriminatory, isolated incident alone is insufficient to support a "hostile work environment" claim. Accordingly, even if Plaintiff's hostile work environment claim is properly before the Court, the Court finds that the claim is not supported by any evidence and that summary judgment is due to be **GRANTED** in favor of Defendants.

3. Equal Pay Act and Title VII Wage Discrimination Claims

In response to Defendants' motion, Plaintiff also raises, for the first time, an Equal Pay Act (EPA) claim. The EPA applies to disparities in pay between male and female employees. The law prohibits employers from paying employees of one sex less than employees of another sex for equal work. Beavers v. Am. Cast Iron Pipe Co., 975 F.2d 792, 801 (11th Cir.1992). In order to establish a prima facie case for an EPA violation, a plaintiff must show that her employer "pays different wages to employees of opposite sexes 'for equal work on jobs ... [requiring] equal skill, effort and responsibility, and which are performed under similar working conditions.'" Corning Glass Works v. Brennan, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (quoting 29 U.S.C. § 206(d)(1)).

Here, there is absolutely no mention of the EPA or any gender-based discrimination claim in the Complaint, and only one paragraph of the Complaint makes reference to Plaintiff's pay. It states:

> On information and belief Defendants had a pattern and practice of paying male and **white female** criminal investigators different rates of pay for doing the same work which further shows Defendants discriminatory acts against Plaintiff.

(Compl. at ¶ 27) (emphasis added). This allegation belies Plaintiff's supposed gender-based claim. Plaintiff plainly alleges that females were paid some of the higher wages, and she does not allege

that the males were paid more than those females referenced. This single allegation does not state a claim for wage discrimination under EPA. In fact, as reflected in Defendants' Brief in Support of Summary Judgment, Defendants did not have notice of this claim and were still guessing which claims Plaintiff was trying to pursue. Defendants accordingly objected to Plaintiff raising this claim at summary judgment, and this Court agrees that Plaintiff's new EPA claim is not properly before the Court. Plaintiff did not state an EPA claim in her Complaint or otherwise seek leave to amend her Complaint to add such a claim pursuant to Fed. R. Civ. P. 15(a); she raised the claim for the first time at the summary judgment stage. Therefore, the Court need not address it. See Gilmour, 382 F.3d at 1314; McShane, 144 Fed. Appx. at 789.

However, Defendants apparently do not object to Plaintiff now pursing a claim for wage discrimination under Title VII. In the absence of any objection, the Court will treat the claim like it was properly raised, see Price, 177 Fed.Appx. at 11, n.7., but nevertheless finds that the claim fails.

A "plaintiff establishes a prima facie case of gender-based wage discrimination under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992). There does not appear to be a real dispute between the parties as to either of these requirements. Defendants have, however, demonstrated a legitimate, non-discriminatory reason for the pay disparities. In particular, Defendants show that pay disparities were warranted by the comparator's specialized qualifications. For example, Defendants identify evidence that Bruce Phelps, a white male investigator (and the only comparator named in Plaintiff's Brief), was hired at a higher salary than Plaintiff because of his specialized experience as an embalmer in the funeral industry and his work as an Emergency Medical Technician. Defendants show that they believed his experience within the funeral industry would benefit the agency with regard to Funeral Service

29

Board investigations. It is undisputed that Plaintiff did not have this type of experience. To boost the veracity of this explanation, Defendants further offer evidence that one of the highest paid investigators is an African-American female, Denise Williams, and that a white male investigator, Michael Browning, was actually paid less than Plaintiff.

In light of this proffered legitimate, non-discriminatory reason for the pay disparity, Plaintiff is required to come forward with evidence demonstrating that the proffered justifications are actually a pretext for gender-based discrimination. Id. Plaintiff has failed to do this. In her Brief, Plaintiff asserts (1) that Plaintiff's "nearest male counterpart" had a higher salary than hers; (2) that all three jobs she applied for were given to men; and (3) that Bruce Phelps was paid more money, could not type, and was lacking in law enforcement experience. Plaintiff fails, however, to identify evidence that actually underminds the veracity of Defendants' reason for the pay disparity or that reveals any real discriminatory animus on the part of Defendants. She points to no evidence to show that she was as qualified as the men who were paid higher salaries. Plaintiff states only that her "nearest male counterpart" had a higher salary; she does not identify this comparator in her brief or state why his higher salary would not be justified in light of her similar experience and training. Plaintiff also fails to identify evidence demonstrating that Bruce Phelps' higher salary was not warranted by his special training as an embalmer and an Emergency Medical Technician. And while Plaintiff asserts that her wage discrimination claim is proved by the fact that "all three jobs she applied for were given to men," Plaintiff fails to provide any information in her brief about the jobs, the qualifications for those positions, or the men who were awarded those positions. The Court also finds it relevant that Plaintiff is unable to rebut Defendants' evidence showing that one of the highest paid investigators at the SoS is an African-American female and that a white male investigator was actually paid less than Plaintiff. These facts, in particular, seem to quash

Plaintiff's claim of gender-based wage discrimination.

Therefore, Plaintiff has simply failed to identify sufficient evidence for a reasonable factfinder to conclude that Defendants' proffered non-discriminatory reason for the pay disparity is pretextual. Clearly, on summary judgment, the nonmoving party is required identify "specific facts showing that there is a genuine issue for trial." Celotex Corp, 477 U.S. at 324. It was Plaintiff's burden to identify each piece of evidence she felt would create a genuine issue of fact. This Court is not required to scour the record (or even the statement of facts) to identify the evidence that could create a genuine issue of material fact.[4] Because Plaintiff has failed to meet her evidentiary burden on summary judgment, Defendants' motion is due to be **GRANTED** as to Plaintiff's Title VII claim for gender-based wage discrimination.

To the extent that Plaintiff intends to also bring a race-based wage discrimination claim under Title VII, the Court will, for a different reason, not consider it. Plaintiff fails to address any race-based wage discrimination claim at summary judgment. The portion of her brief dedicated to the wage discrimination issue addresses only her gender-based claim. Plaintiff makes no argument to rebut Defendants' showing that she cannot establish a prima facie case of race-based wage discrimination under Title VII or rebut Defendants' proffered legitimate, non-discriminatory reasons for the pay disparity. Plaintiff, in fact, does not identify *any* evidence demonstrating that she was paid less than similarly-situated employees because of her race. Accordingly, Plaintiff's

---

[4] See Tomasini v. Mount Sinai Medical Center of Florida, Inc., 315 F.Supp.2d 1252, 1260 n.11 (S.D. Fla., 2004) ("It is the non-moving party's burden to present evidence to preclude the entry of summary judgment. While Defendant has raised the issue of whether Plaintiff lied to the recruiter in its Statement of Facts, the Court is not required to "scour the record to determine whether there exists a genuine issue of material fact to preclude summary judgment.") (citing L.S. Heath & Son, Inc. v. AT & T Info. Sys. Inc., 9 F.3d 561, 567 (7th Cir. 1993)); see also, Compania de Elaborados de Café v. Cardinal Capital Mgmt., Inc., 401 F. Supp.2d 1270, 1282 n.5 (S.D. Fla. 2003) ("While Plaintiffs have identified 'six statements of contested facts,' and attached exhibits to their response, the Court is not required to 'scour the record to determine whether there exists a genuine issue of material fact to preclude summary judgment.'").

race-based wage discrimination claim is deemed to have been abandoned.  See Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir.2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment).  Thus, assuming Plaintiff's Title VII race-based wage discrimination claim is properly before the Court, Defendants' motion for summary judgment is **GRANTED** as to that claim too.

## CONCLUSION

Accordingly, and for the reasons discussed above, Defendants' Motion for Summary Judgment [Doc. 19] is hereby **GRANTED** as to all claims.

**SO ORDERED** this 25th day of October, 2010

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

jlr